UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JANE DOE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CAUSE OF ACTION: |
| v. | § | |
| | § | 1:22-cv-00299 |
| CITY OF AUSTIN, and WALTER | § | |
| DODDS, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Jane Doe brings this 42 U.S.C. § 1983 case against the City of Austin and Austin Police Department Officer Walter Dodds for the sexual assault she experienced at the hands of Officer Dodds.

## I. PARTIES

1. Plaintiff Jane Doe is a resident of Travis County, Texas. Plaintiff files under a pseudonym to protect her privacy and safety.

2. Defendant City of Austin is a municipality that operates the Austin Police Department. Defendant City of Austin may be served through its City Clerk at 301 W. 2nd Street, Austin, TX 78701. The City's policymaker for policing matters was former Police Chief Brian Manley at the time of the incident and is currently Chief Joseph Chacon.

3. Defendant Officer Walter Tyson Dodds was at the time of this incident an Austin Police Department officer and he is sued in his individual capacity for compensatory and punitive damages. He can be served with process via his former employer at 715 E. 8th Street, Austin, Texas 78701; via his attorneys, Douglas K. O'Connell at 505 West 12th Street, Suite 200, Austin, Texas 78701 and Ken Ervin at 1301 Rio Grande St., Austin, Texas 78701; at his home in

Lexington, Texas; or wherever he may be found. Officer Dodds was acting under color of law as an Austin Police Department officer at all relevant times.

## II. JURISDICTION AND VENUE

4.   This Court has federal question jurisdiction over this 42 U.S.C. § 1983 action pursuant to 28 U.S.C. §§ 1331 and 1343.

5.   This Court has general personal jurisdiction over Defendant City of Austin as it is located in Travis County, Texas and over Defendant Dodds as he resides in Lee County, Texas.

6.   This Court has specific *in personam* jurisdiction over Defendants because this case arises out of conduct by Defendants that injured Plaintiff Jane Doe, and which occurred in Travis County, Texas, which is within the Western District of Texas.

7.   Venue of this cause is proper in the Western District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in Travis County, which is within the Western District of Texas.

## III. FACTS

### A.  Dodds' attack on Doe

8.   On April 18, 2020, Jane Doe and her boyfriend, A.G., had an argument during which A.G. had a breakdown, put a belt around his throat, and tightened it to threaten suicide.

9.   Doe yelled to her nephew to go get help.

10.   Doe's nephew went to his mother in a nearby apartment who called 911 to get help from APD.

11.   At approximately 6:13pm, Defendant Officer Walter Dodds, while on duty as an Austin Police Officer, responded and arrived on scene.

12.   Officer Dodds conducted interviews with Jane Doe and A.G.

13.     Officer Dodds determined that A.G. was a danger to himself and needed to be placed under an emergency detention.

14.     Austin Emergency Medical Services (EMS) arrived on scene and determined that A.G. would need to be transported to the hospital.

15.     During Officer Dodds' interview with Doe, he asked for her phone number and told her that he would be calling her to tell her where A.G. was being taken.

16.     At the end of the interview, Officer Dodds asked Doe about locking the door to her apartment.

17.     Officer Dodds said, "What if someone sneaks in there? You don't want to be sleeping with some dude in there with you."

18.     Officer Dodds then accompanied A.G. to the hospital and completed the required documentation for A.G.'s emergency detention.

19.     Then at 6:54pm, Officer Dodds called Doe from his APD-issued cell phone.

20.     Officer Dodds started the call by telling Doe which hospital A.G. had been taken to, but then began to ask if he could come over. Doe did not give consent for Officer Dodds to come to her home.

21.     Officer Dodds then asked her if Doe would take off his uniform for him and again if he could come over. Again, Doe did not consent to allow the officer into her apartment or to take off his uniform. Doe ended the call.

22.     Officer Dodds called Doe four more times from the same APD-issued cell phone between 6:54pm and 9:09pm, but Doe did not pick up any of these calls.

23.     After 9:09pm, Doe fell asleep in her bedroom alone.

24.     Sometime after Doe fell asleep, Officer Dodds again went to Doe's apartment and knocked on the door.

25.     Doe's minor nephew opened the door and saw Officer Dodds in his full uniform, including his gun and full duty belt.

26.     Officer Dodds walked by Doe's nephew, directly into Doe's bedroom, and shut the door behind him.

27.     Doe awoke to Officer Dodds in her bedroom penetrating her vagina with his penis.

28.     Doe was shocked, frightened, and confused about what was going on and never consented to any contact of any kind from Officer Dodds.

29.     Officer Dodds then flipped her onto her stomach and forced his penis into her vagina two more times.

30.     Officer Dodds was not wearing a condom and ejaculated onto the fitted sheet on her bed. Doe remained terrified.

31.     That sheet was later tested for DNA evidence by APD. The DNA analysis confirmed that Officer Dodds' DNA was present on the sheet.

32.     Over the next several days, Officer Dodds continued to call Doe and terrorize her.

33.     On April 25, 2020, Officer Dodds called Doe, disguising his number.

34.     Doe picked up the phone, recognized Dodds' voice immediately, and heard him ask who she was with and what she was doing.

35.     Terrified, Doe answered that she was with her husband and hung up the phone.

36.     On April 26, 2020, at approximately 5:30pm, Doe saw Officer Dodds drive by her apartment complex in his police vehicle, slowly drove down the dead end of her parking lot, turned

around and drove away. Doe's nephew took a photo of the vehicle, which APD later confirmed was Dodds' assigned police car for that day.

37.     On April 27, 2020, at 4:40pm, Dodds called Doe again, using *67 to hide his phone number.

38.     Officer Dodds again asked her what she was doing and if he could come over. Doe, recording the call, repeatedly asked him to say his name, but Dodds only responded, "It's me."

39.     On April 29, 2020, Doe called 911 to report the sexual assault by Officer Dodds.

40.     Officer Walter Dodds was criminally indicted for Sexual Assault and Official Oppression and was arrested on September 10, 2020.

**B.  APD's tolerance for sexual misconduct amongst its own ranks**

41.     Art Acevedo was the APD chief from 2007 until the end of 2016.

42.     In May 2008, Acevedo fired APD Sergeant Dustin Lee, a 12-year veteran, for sexual harassment of a coworker. However, APD later rescinded the termination. In 2019, Lee, by then an APD Lieutenant who had been working in APD for 23 years, was arrested by Round Rock Police for sexual assault of a child.

43.     In 2014, APD officers Michael Castillo and Mark Lytle were caught on their body worn cameras whistling at a woman walking by, mockingly suggesting she call the police, and then warning her that the police cannot "unrape you."

44.     Despite the publicity, on information and belief, then-police chief Art Acevedo did not seriously discipline Castillo or Lytle.

45.     Also while chief, on information and belief, Acevedo dismissed allegations by his subordinate female officers that male APD officers had assaulted them. While he was the

policymaker for law enforcement in Austin, Acevedo allegedly said some of these allegations of sexual violence by APD officers were just about "bad sex."

46.     On information and belief, during Acevedo's tenure as chief, the sex crimes unit maintained a wall with photos of people the unit had unilaterally determined to have submitted a "false report" of sexual violence.

47.     Acevedo was succeeded by Brian Manley, who served as chief from 2016 until 2021.

48.     During Manley's tenure, APD's longstanding culture of sexual misconduct came to the forefront of the public consciousness.

49.     In December 2018, Manley terminated an APD commander, Jason Dusterhoft, for allegedly beating his then-girlfriend, including by strangling her during sex.

50.     Dusterhoft countered that Manley had intentionally used the sex crimes division to pressure his ex-girlfriend into fabricating the allegations, pointing out that Manley himself admitted the allegations were not credible.

51.     Dusterhoft alleges, in an ongoing lawsuit, that he had personally alerted Manley to a then-dire backlog in sexual assault kit testing—a backlog which was a source of enormous public embarrassment for Manley and reinforced the belief that APD did not take allegations of sexual assault seriously.

52.     A 2020 report by Lisa Tatum, ordered by the City of Austin's City Manager and released the day before Dodds attacked Doe, found that APD retained a culture of sexism.

53.     The Tatum report found that APD's Senior Chaplain, Rick Randall, often makes sexist comments.

54.     The Tatum investigation also received many reports from all across APD that sexist name calling, and use of derogatory terms associated with sex, persist.

## C. APD's longstanding failure to investigate sexual violence

55.     A 2018 study, sponsored by the U.S. Department of Justice, found that APD only made arrests in less than ten percent of sexual assault allegations during the year-long study period.

56.     The percentage of arrests is even more abysmal for rape within the meaning of public reporting requirements,[1] and has been for at least the last ten years.

57.     In 2011, out of 211 rapes reported to APD, APD made no arrests.

58.     In 2012, out of 209 rapes reported to APD, APD made just 1 arrest.

59.     In 2013, out of 217 rapes reported to APD, APD made no arrests.

60.     In 2014, out of 571[2] rapes reported to APD, APD only made 4 arrests.

61.     In 2015, out of 487 rapes reported to APD, APD only made 2 arrests.

62.     In 2016, out of 747 rapes reported to APD, APD only made 3 arrests.

63.     In 2017, out of 834 rapes reported to APD, APD only made 9 arrests.

64.     In 2018, out of 787 rapes reported to APD, APD made 89 arrests.

65.     This is partly because the agency intentionally underfunded investigating sexual assault.

---

[1] The Texas Penal Code does not use the term "rape," but the State of Texas and City of Austin often report the crime of "rape" when publishing statistics on crimes and arrests, as they rely upon the FBI's definition of the crime to organize their reporting.
[2] Prior to 2014, the FBI's definition of "rape" was narrower, causing the number of reports and arrests so classified to be lower. APD also underreported the number of reported rapes in 2014, 2015, and 2016.

66.     In 2020, APD assigned only 19 detectives to handle about 1,000 sexual violence cases per year.

67.     APD only had 17 sex crimes detectives in 2018, investigating 787 rapes. By comparison, APD had 12 detectives assigned to investigate 32 murders in 2018.

68.     Sexual violence is rarely prosecuted arising from a complaint to APD when compared to other crimes such as murder, assault, and theft of an automobile. This fact was reported to the Austin City Council in 2019.

69.     Mayor Steve Adler remarked that the City of Austin has "far too many sexual assaults that are resulting in too few perpetrators being taken off our streets."

70.     But APD is not just unskilled in investigating sexual violence; it instead chooses not to press charges for the supermajority of those cases despite sufficient evidence to do so.

71.     For years, APD affirmatively chose to close investigations without adequate investigation. APD covered up its lack of investigations by "exceptionally clearing" about 2 of every 3 rape cases that it closed during the years leading up to the attack on Doe. A case is only supposed to be "exceptionally cleared" if there is an identified suspect, the suspect's location is known, and there is enough information to support an arrest, charge, or turning over the case to the court for prosecution, but for some reason the case does not lead to an arrest, charge, or other prosecution. That means that APD nonetheless did not arrest, charge, or turn over the case to the court system a supermajority of rape cases even when they had enough evidence to do so.

72.     Even worse, in an audit of late 2017 rape cases handled by APD, the Texas Department of Public Safety determined that the Austin Police Department had wrongfully "exceptionally cleared" nearly one-third of its exceptionally cleared rape cases during the audited period.

73.     The Texas Department of Public Safety audit further confirmed that nearly half of those wrongfully "exceptionally cleared" cases had "enough information to support an arrest, charge, and turning over to the court for prosecution."

74.     APD Chief Manley agreed with nearly all of DPS's findings, admitting the majority of cases identified by DPS were closed improperly or should not have been closed at all.

75.     But this intentional misclassification was not new information to APD's policymaker. On information and belief, APD's former head of sex crimes, Elizabeth Donegan, had internally complained about and resisted the practice for years.

76.     Moreover, Donegan's superiors within APD had pressured her to deliberately cover up the department's poor investigating success by improperly "exceptionally clearing" cases. After she was pushed out of the department, the rate of "exceptional clearance" rose. Manley admitted he had a "difference of opinion" with Donegan about this issue when he had her transferred.

77.     Aside from Donegan's prophetic complaints about "exceptional clearance," she also publicly warned that APD's sexual assault investigations were not adequately thorough.

78.     These mirror problems with APD's investigation in specific incidents that have been publicized.

79.     For example, on information and belief, in the investigation of the sexual assault of Hanna Senko from 2006, APD never visited the scene of the crime, never interviewed witnesses, and decided to "exceptionally clear" the case before Senko's blood test results even came back—even though she reported her assailant had suspiciously had pills in his pocket before the attack.

80.     In investigating an October 2008 sexual assault, on information and belief, APD questioned the victim's truthfulness, asked her about other men she had had sex with, and asked her whether she had a boyfriend.

81.    To investigate the 2010 sexual assault of Julie Ann Nitsch, on information and belief, APD failed to collect physical evidence including the cords the assailant used as a weapon, broken locks, the glass door the assailant used to enter, or anything else that could be used to identify the assailant. Instead, APD asked Nitsch how much she had to drink, what she had been wearing, and why she lived in a bad neighborhood.

82.    On December 24, 2014, on information and belief, Heather Sin was drugged at a bar and sexually assaulted by several men. The next morning, Sin awoke at railroad tracks and called the police. A physical exam confirmed many injuries including genital injuries consistent with sexual assault. An APD detective later spoke to her and made clear that he did not believe anything had happened to her and would wait on DNA results before investigating at all. After Sin pressed for an explanation, APD suggested they were not pursuing the case because Sin had been drinking. Sin's case remained pending for at least 3 years.

83.    On August 9, 2015, on information and belief, Marina Conner was sexually assaulted. During the assault, Conner made a phone call that recorded her cries for help. Conner spoke to an APD detective on the phone who promised to come meet her, but he never did. Conner obtained a written confession from the assailant. Despite this evidence, APD decided not to pursue the case.

84.    On January 7, 2016, on information and belief, Anisha Ituah was sexually assaulted by a patient at a state hospital. Her family called APD, but APD refused to dispatch anyone, so APD never collected forensic evidence from Ituah. APD's detective also complained to Ituah that he had a huge case load of over 300 rape victims and he cannot get every case done. The detective also blamed Ituah for her own assault and suggested he would not investigate. Travis County later told her family that APD was not pursuing the case.

85.     Even more alarming is APD's response to a series of sexual violence that Amanda Day reported to APD. In 2018, on information and belief, APD told her that it would not investigate because she had previously consented to "kissing and stuff" with her violent assailant who repeatedly sexually assaulted her. The APD officer also asked her what panties she was wearing and inaccurately told the victim that the sexual assaults were "family violence," before refusing to investigate further.

86.     Also in 2018, on information and belief, APD closed a case investigating sexual assault allegations by Jessica Ragsdill. In that case, APD obtained video footage confirming the suspect had entered a hotel room with the victim while she was so intoxicated that she could not stand. APD also had photographic evidence reflecting that the sexual assault was so violent that Ragsdill was bleeding and bruised. But APD decided not to pursue the case regardless, and "exceptionally cleared" the report of sexual assault.

87.     In January 2018, on information and belief, Emily Borchardt was repeatedly and violently sexually assaulted by a ring of sex traffickers who abducted her, locked her in a motel room, and repeatedly threatened to kill her. After at least 10 hours, Borchardt finally escaped and called APD. The first officer to respond rolled his eyes and was impatient. APD failed to collect surveillance video or other physical evidence from the motel. The detective assigned to the case told Borchardt's mother that some of the events "sounded consensual." The detective later characterized the bruising on Borchardt's neck where her assailants had strangled her as a "hickey." Eventually APD declined to pursue the investigation further.

88.     On information and belief, during the years leading up to the attack on Doe, APD officers routinely told sexual assault victims that their assaults "sounded consensual."

89.     On information and belief, during the years leading up to the attack on Doe, APD officers routinely characterized victims of sexual violence as "bad victims" if they knew their attacker.

90.     On information and belief, during the years leading up to the attack on Doe, APD detectives assigned to investigate sexual violence often rolled their eyes at the victim's allegations, then dismissed them because the assailant claimed the encounter was consensual.

91.     On information and belief, during the years leading up to the attack on Doe, APD officers assigned to investigate sexual violence routinely criticized victims for their clothing, for where they live, and for drinking alcohol.

92.     On information and belief, during the years leading up to the attack on Doe, APD officers have been accused of sexual assault but not prosecuted.

93.     Because APD systemically refused to properly investigate sexual violence, systemically covered up their failures, and maintained a culture that tolerated sexual violence even by police officers, predators like Officer Dodds were emboldened and believed they could engage in sexual violence with impunity.

## IV. CAUSES OF ACTION

### A. FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS – AS TO DEFENDANT OFFICER DODDS

94.     Plaintiff incorporates the preceding paragraphs as if alleged herein.

95.     Austin Police Department Officer Dodds, while acting under color of law, violated Plaintiff Doe's substantive due process right to bodily integrity by penetrating her with his penis without her consent.

96.     Doe has suffered significant injuries as a result of Officer Dodds' sexual assault.

97.     Austin Police Department Officer Dodds' assault shocks the conscience. Without any legitimate reason, Officer Dodds entered Plaintiff's home at night, penetrated her without her consent, and proceeded to intentionally terrify her by driving by her home in his APD cruiser and calling her cell phone from blocked numbers.

98.     Therefore, Austin Police Department Officer Dodds violated Doe's clearly established Fourteenth Amendment right to bodily integrity in such a way that clearly shocks the conscience and directly and proximately caused Doe to suffer significant injuries.

99.     In addition, Austin Police Department Officer Dodds, while acting under color of law, entered Plaintiff Doe's home without permission and used excessive force on Plaintiff Doe by penetrating her with his penis without her consent in her own home.

100.    Officer Dodds unlawfully entered Doe's home and then seized Doe by using force on her, trapping her in her bedroom, restraining her freedom to leave, and restraining her freedom to decline his unwanted sexual conduct and penetration.

101.    Austin Police Department Officer Dodds' use of force was wholly excessive to any conceivable need, objectively unreasonable in light of clearly established law, conscience shocking and directly caused Plaintiff Doe to suffer serious injuries.

102.    Therefore, Austin Police Department Officer Dodds violated Doe's clearly established Fourth Amendment rights.

103.    Officer Dodds acted under color of law in the course of his violations of Plaintiff Doe's rights when he used his police investigation of her 911 call as pretext to find out where she lived, her phone number, and whether she would be vulnerable to his assault; used his police investigation as a pretext to contact her again and press unwanted sexual advances; used his police-issued phone to call her repeatedly before the sexual assault; used his APD badge and uniform to

gain access to her home; kept his uniform on—including his APD badge and APD issued gun—while sexually assaulting Doe; intimidated her nephew with his authority as a police officer as well as his uniform, badge, and service weapon; and terrified her with his service weapon and police authority. Officer Dodds also drove by her home in his APD cruiser in order to further terrify and intimidate her in an effort to prevent her from reporting the misconduct and prepare to attack her again.

104.    As a direct and proximate result of Austin Police Department Officers Dodds' actions, Doe suffered and continues to suffer significant injuries.

105.    Doe brings these claims pursuant to 42 U.S.C. § 1983.

**B. PUNITIVE/EXEMPLARY DAMAGES – AS TO DEFENDANT DODDS**

106.    Plaintiff incorporates the preceding paragraphs as if alleged herein.

107.    Defendant's conduct was egregious, reckless, and endangered countless community members. Plaintiff seeks punitive damages as well to deter future similar violations of constitutional rights.

**C. FOURTH AND FOURTEENTH AMENDMENT – FAILURE TO TRAIN, SUPERVISE, AND PROTECT AS TO DEFENDANT CITY OF AUSTIN**

108.    Plaintiff incorporates the preceding paragraphs as if alleged herein.

109.    The City of Austin, had the following policies, practices, or customs in place when APD Officer Dodds sexually assaulted Doe:

   a.  Failure to train officers about preventing sexual harassment and sexual assault;

   b.  Failure to supervise officers known or that should have been known to have sexually harassed or sexually assaulted in the past;

   c.  Failure to discipline officers for domestic violence or sexual assault in the past;

d.  Wrongfully clearing complaints that officers and members of the public engaged in sexual assault;

e.  Wrongfully failing to investigate complaints that officers and members of the public engaged in sexual assault;

f.  Adopting a culture of tolerance for sexual violence and unjustified skepticism of reports of sexual violence;

g.  Failure to adequately investigate officers' history of sexual harassment or sexual assault in the past;

h.  Failure to protect the public from known dangerous servants while giving them the tools and authority to perpetrate attacks on innocent civilians with impunity; and

i.  Failure to investigate APD officers accused of sexual assault.

110.    Each of the policies, practices, or customs delineated above was actually known, constructively known, approved, and/or ratified by City of Austin and its policymaker for law enforcement purposes, Chief of Police, Brian Manley, and was promulgated with deliberate indifference to Doe's Fourth and Fourteenth Amendment rights under the United States Constitution. Moreover, the known and obvious consequence of these policies, practices, or customs was that Austin Police Department officers would be placed in recurring situations where constitutional violations similar to those inflicted on Doe would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

111.    Consequently, the policies and conduct delineated above were a moving force of Plaintiff's constitutional deprivations and injuries, and proximately caused severe damages to Plaintiff.

112.     Plaintiff Doe brings this claim pursuant to 42 U.S.C. § 1983.

## V.  DAMAGES

113.     Plaintiff Doe seeks the following damages:

a.   Past and future medical expenses;

b.   Past and future economic damages, including (but not limited to) loss of earning capacity;

c.   Past and future physical pain and mental anguish;

d.   Past and future impairment;

e.   Past and future disfigurement;

f.   Punitive damages at to Defendant Dodds only;

g.   Loss of consortium; and,

h.   Attorneys' fees pursuant to 42 U.S.C. § 1988.

## VI. JURY DEMAND

114.     Pursuant to Federal Rule of Civil Procedure 48, Plaintiff hereby requests a jury trial.

## VII.  PRAYER FOR RELIEF

115.     To right this injustice, Plaintiff requests the Court:

a.   Award compensatory damages against Defendants;

b.   Award exemplary damages against Defendant Dodds only;

c.   Award Plaintiff costs and fees, including but not limited to expert fees and attorneys' fees, pursuant to 42 U.S.C. § 1988;

d.   Award pre-judgment and post-judgment interest at the highest rate allowable under the law; and,

e.   Award and grant such other just relief as the Court deems proper.

Dated: March 30, 2022.

Respectfully submitted,


**EDWARDS LAW**
603 W 17th St., Austin
Texas 78701
Tel.  512-623-7727
Fax.  512-623-7729

By    /s/ Jeff Edwards
      JEFF EDWARDS
      State Bar No. 24014406
      jeff@edwards-law.com
      DAVID JAMES
      State Bar No. 24092572
      david@edwards-law.com
      PAUL SAMUEL
      State Bar No. 24124463
      paul@edwards-law.com

**ATTORNEYS FOR PLAINTIFF**


## <u>CERTIFICATE OF SERVICE</u>

By my signature below I certify that a true and correct copy of this document has been filed with the Court's electronic case filing system. No other parties have appeared to be served via this filing. Diligent efforts to serve this filing will be made in accordance with the Federal Rules of Civil Procedure.


<u>/s/ Jeff Edwards</u>

Jeff Edwards